BENJAMIN Y. KAUFMAN (pro hac vice)
PATRICK DONOVAN (pro hac vice)
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
270 Madison Avenue
New York, New York 10016
Telephone: 212-545-4600
Facsimile: 212-545-4677
kaufman@whafh.com
donovan@whafh.com
Counsel for Plaintiffs

[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| KATELYN GRAY,<br><br>Plaintiff,<br><br>v.<br><br>SATYA NADELLA, AMY E. HOOD, JARED SPATARO, RAJESH JHA, REID HOFFMAN, HUGH JOHNSTON, TERI LIST, CATHERINE MACGREGOR, MARK MASON, SANDRA E. PETERSON, PENNY PRITZKER, CHARLES W. SCHARF, JOHN W. STANTON, and EMMA WALMSLEY,<br><br>Defendants.<br><br>and<br><br>MICROSOFT CORPORATION<br><br>Nominal Defendant. | Case No: ______________<br><br>**SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND VIOLATION OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

1. Plaintiff Katelyn Gray ("Plaintiff"), derivatively on behalf of Microsoft Corporation ("Microsoft" or the "Company"), by and through her attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Microsoft with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Microsoft; (c) review and analysis of information disseminated by Defendants through online forums, group chats, and social media; and (d) review of other publicly available information concerning Microsoft. Plaintiff believes that additional evidentiary support for the allegations will be uncovered following a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

2. Plaintiff brings this shareholder derivative action on behalf of Microsoft to address and remedy corporate wrongdoing by certain of Microsoft's officers and directors. From January 1, 2022, through the present (the "Relevant Period"), Defendants (defined below) caused Microsoft to make false and misleading statements and/or omit from disclosure material information regarding the Company's artificial intelligence ("AI") strategy, the Company's "Copilot" family of products and its financial results. Further, during the Relevant Period, Defendants also caused the Company to violate copyright and intellectual property ("IP") laws by training its AI software on copyrighted works without obtaining or possessing the required lawful licenses.

3. The Company told its shareholders and the market that it had not violated federal copyright laws in the development and training of its AI software, AI generative models, and products, stating "Generative AI models – Microsoft uses a variety of data sources, including publicly available information, in a manner consistent with global copyright laws[;]" that "we do

not train on data from domains listed in the Office of the United States Trade Representative Notorious Markets for Counterfeiting and Piracy list" and instead, "we train on data that we gain access to (such as archives and metadata) through negotiated arrangements with publishers and copyright owners."

4. Starting in September 2023, the Company began facing a series of lawsuits alleging copyright infringement brought by numerous authors and copyright holders. The first such case was *Authors Guild v. OpenAI & Microsoft Corp*., No. 1:23-cv-08292 (S.D.N.Y.). That case was originally brought as a class action against OpenAI and Microsoft was added as a defendant in a December 2023 amended complaint (the "Authors Guild Complaint"). *Authors Guild*, ECF No. 40. The plaintiffs in the *Authors Guild* action include the Authors Guild, David Baldacci, Jonathan Franzen, John Grisham, George R. R. Martin, Jodi Picoult, and many other best-selling novelists. The Authors Guild Complaint alleges, in pertinent part, that: (1) Microsoft copied hundreds of thousands of copyrighted books without permission to train GPT models; (2) Microsoft knowingly participated by investing billions of dollars in Open AI, providing supercomputing infrastructure, integrating GPT into Bing Chat and Copilot, and sharing in the commercial exploitation of the models; and (3) the models can generate summaries and passages derived from the copyrighted works, diminishing the market for the licensed works.

5. In January 2024, *Basbanes v. Microsoft Corp. & Open AI*, No. 1:24-cv-00084 (S.D.N.Y.) was filed. The complaint in *Basbanes* (the "Basbanes Complaint") focuses on nonfiction books and alleges that Microsoft: (1) trained its AI by copying plaintiff's books; (2) the copying occurred without licenses; (3) Microsoft was an active participant rather than merely an investor; and (4) Microsoft's products commercially exploit the infringing models. The Basbanes

Complaint seeks actual damages, statutory damages, disgorgement of profits and an injunction preventing further use of copyrighted books.

6. On June 24, 2025, numerous authors, including Kai Bird, Daniel Okrent, and Jia Tolentino, among others, filed another lawsuit – *Bird v. Microsoft Corp*., 1:25-cv-05282 (S.D.N.Y.) - against Microsoft alleging: (1) Microsoft copied nearly 200,000 pirated books (primarily from the Books3 dataset); (2) used those books to train its Megatron AI models; (3) infringed the copyrights of those works by reproducing and using the works without necessary licenses or permission; and (4) seeking statutory damages and an injunction.

7. Then, on June 24, 2026, nearly 400 U.S. print and digital newspaper publishers brought a lawsuit against Microsoft – *Richner Communications, Inc., v. Microsoft Corp.,* No. 26-cv-5320 (S.D.N.Y.) - for allegedly using copyrighted content without license or permission to trade the Company's large language models such as Microsoft Copilot. The complaint (the "Richner Complaint") alleges that Microsoft: (1) systematically and secretly pulled from publisher websites including information behind paywalls; (2) copied articles and other original works into their own servers; (3) stripped copyright management information before using the content to train AI models; and (4) used the materials to train AI models, which, in turn, allegedly reproduced it substantially verbatim in response to user prompts.

8. The Authors Guild, Basbanes, Bird and Richner Complaints, collectively, allege that Microsoft was not a mere passive investor. Indeed, Microsoft has: (1) invested more than $10 billion in Open AI; (2) supplied that Azure infrastructure on which the models were trained; (3) helped develop, market and profit from GPT-based systems and products such as Microsoft Copilot; and (4) had knowledge that copyrighted works were being used for training the AI models.

As a result, Microsoft is facing claims of liability because of its direct participation in the development and commercialization of AI systems.

9. While litigation exposure mounted, Microsoft, by and through its officers and directors, issued materially false and misleading statements regarding its AI strategy including: (i) the success of its Copilot family of products, while recklessly and/or with knowledge concealing material issues including the repeated violations of the federal copyright laws in its AI development, as well as its partnership with AI companies like Open AI; (ii) the Company's Copilot software experienced major issues with brand positioning, user experience, usage, data siloing, computational capacity, organization, and interoperability; and (iii) the Company's proprietary AI model was performing well below competitors on several industry tests. Accordingly, even when built upon repeated and systemic violations of federal copyright law, the Company's AI model and products were lagging well behind competitor models and products.

10. As a result of Defendants' misconduct, Microsoft (and its shareholders) have suffered substantial damage. The misconduct was committed by and/or at the direction of the most senior executive officers and directors of the Company.

11. This shareholder derivative action seeks to hold Microsoft's officers and directors responsible for the breaches of fiduciary duties and causing the Company to engage in widespread violation of federal copyright and securities laws, which have caused and will continue to cause substantial damages to Microsoft.

## JURISDICTION AND VENUE

12. This action asserts claims that raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, and accordingly, the Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331. The Court also has

supplemental jurisdiction regarding the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

13. This District is an appropriate and proper venue pursuant to 28 U.S.C § 1391(b) because certain of the events or omissions giving rise the claims asserted herein occurred in this District including, but not limited to, the dissemination of the statements alleged be materially false and misleading into the District and the acts of corporate wrongdoing, which caused the Company to repeatedly and systematically violate federal copyright laws, occurred in this District.

14. The Court has personal jurisdiction over each and every Defendant named herein because each Defendant is either a corporation that conducts business and maintains operations in this District or is an individual who has sufficient minimum contacts within this District to render exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

15. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and/or indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

16. Plaintiff Katelyn Gray is a current shareholder of Microsoft and has continuously held and owned the shares of Microsoft at all relevant times.

17. Defendant Satya Nadella ("Nadella") served as Microsoft's Chief Executive Officer ("CEO") and Chairman of the Board of Directors during the Relevant Period.

18. Defendant Amy E. Hood ("Hood") served as Microsoft's Chief Financial Officer ("CFO") and Executive Vice President during the Relevant Period.

19. Defendant Jared Spataro ("Spataro") served as Microsoft's Chief Marketing Officers, AI at Work ("AI CMO") during the Relevant Period.

20. Defendant Rajesh Jha ("Jha") served as Microsoft's Executive Vice President, Experiences and Devices ("EVP E&D") during the Relevant Period. In March 2026, the Company announced that Defendant Jha would be retiring after more than 35 years of working for the Company.

21. Defendants Nadella, Hood, Spataro and Jha are collectively referred to herein as the "Officer Defendants."

22. Defendant Reid Hoffman ("Hoffman") served as a Microsoft director during the Relevant Period. Hoffman also served on the Board's Environmental, Social, and Public Policy Committee during the Relevant Period.

23. Defendant Hugh Johnston ("Johnston") has served as a Microsoft director during the Relevant Period. Johnston also served as Chairperson of the Audit Committee during the Relevant Period.

24. Defendant Teri List ("List") served as a Microsoft director during the Relevant Period. List also served on the Audit Committee during the Relevant Period.

25. Defendant Catherine MacGregor ("MacGregor") served as a Microsoft director during the Relevant Period. MacGregor also served on the Board's Environmental, Social, and Public Policy Committee during the Relevant Period.

26. Defendant Mark Mason ("Mason") served as a Microsoft director during the Relevant Period.

27. Defendant Sandra E. Peterson ("Peterson") served as a Microsoft director during the Relevant Period.

28. Defendant Penny Pritzker ("Pritzker") served as a Microsoft director during the Relevant Period. Pritzker also served as the Chairperson of the Board's Environmental, Social and Public Policy Committee during the Relevant Period.

29. Defendant Charles W. Scharf ("Scharf") served as a Microsoft director during the Relevant Period.

30. Defendant John W. Stanton ("Stanton") served as a Microsoft director during the Relevant Period. Stanton also served on the Board's Environmental, Social, and Public Policy Committee and the Audit Committee during the Relevant Period.

31. Defendant Emma Walmsley ("Walmsley") served as a Microsoft director during the Relevant Period. Walmsley has also served on the Board's Environmental, Social, and Public Policy Committee during the Relevant Period.

32. Defendants Nadella, Hoffman, Johnston, List, MacGregor, Peterson, Prtizker, Scharf, Stanton and Walmsley are referred to collectively herein as the "Director Defendants."

33. Nominal Defendant Microsoft is a multinational technology conglomerate headquartered in Redmond, Washington and incorporated in Washington. The Company's common stock trades on the NASDAQ under the ticker symbol "MSFT."

34. Collectively, the Officer and Director Defendants are referred to herein as the Defendants. Each of the Defendants was directly involved in the management, day-to-day and core operations of the Company at the highest levels and were privy to Microsoft's confidential proprietary information and its business, operations, services, partners and present and future business prospects, as alleged herein. The Officer Defendants were centrally involved in drafting, reviewing and/or disseminating the false and misleading statements alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued by themselves or the

Company, and approved, ratified and/or certified these statements, in violation of the federal securities laws.

35. Defendants, as the officers and controlling persons of Microsoft, a publicly held company, whose securities are registered with the SEC and trade on the NASDAQ, had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, services, partners, and present and future business prospects. In addition, Defendants had a duty to correct previously issued statements that had become materially misleading or false, so that the market price of Microsoft common stock accurately reflected Microsoft's true and accurate state.

36. As a result of their positions of control and authority within the Company, Defendants were able to and did, control the content of the various SEC filings, press releases and other public statements during the Relevant Period. Defendants were each provided copies of the documents and statements alleged to be false and misleading before or shortly after their issuance, participated in calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Defendants is responsible for the accuracy of their and the Company's public statements detailed herein and therefore, is primarily liable for the misrepresentations and/or omissions contained therein.

## FACTUAL ALLEGATIONS

37. Founded in 1975, Microsoft is a key player in the development and spread of personal computing technology, in particular through its proprietary Windows operating system and platform, which most computers run on. Microsoft has evolved over the years and expanded its offerings to include enterprise software, cloud computing, online services, gaming and

technological hardware, as well as other products, services and offerings. To continue its growth, the Company has integrated artificial intelligence ("AI") into its products, services and offerings. The Company has strategically aimed to embed AI across its cloud infrastructure and productivity tools and thereby, secure long-term platform lock-in.

38. Microsoft's Intelligent Cloud division is its largest and fastest growing segment and Azure, its cloud computing platform, is a crown jewel of the reporting segment. Azure relies on the Company's global network of data centers to provide customers with computing, networking, storage, mobile, and web application services, AI, Internet of Things, cognitive services, and machine learning. Azure AI services are a primary growth engine for the Company, driving double-digit revenue jumps as the Company continues to build out its massive global data center footprint. During fiscal year 2025, Azure revenues were over $75 billion, a year-over-year increase of 34%, which drove a 14% increase in gross margin for the Intelligent Cloud segment. Throughout the Relevant Period, Defendants represented that Microsoft's revenue growth would continue to be driven by Azure.

39. Azure's recent growth has been driven by Microsoft's incorporation of AI capabilities throughout its platform's products and services. The Company has been at the forefront of AI development and the Company's executives have proclaimed the central importance of AI technologies to the Company's business and prospects. Microsoft has embedded Microsoft 365 Copilot into its suite of enterprise tools (Teams, Office, GitHub), reaching over 100 million active users per month. Microsoft has positioned itself as a leader in generative AI and has repeatedly emphasized the importance of AI to Microsoft's strategy, competitive position and future growth. To advance that strategy, Microsoft has invested billions of dollars in companies

developing large language models ("LLMs") – AI systems trained on massive datasets to perform natural language tasks, including generating human-like text and other content.

40. Specifically, since 2019 Microsoft has invested over $13 billion in OpenAI, the developer of ChatGPT LLM. Microsoft has also committed to investing billions more in Anthropic, the developer of Claude LLM. After its investment in OpenAI, Microsoft also became a collaborator alongside OpenAI in the development of AI systems. Those collaborations involved training AI systems using copyrighted materials without the legal permission or licenses.

41. In 2023, Microsoft introduced its proprietary generative AI chatbot, Copilot. Copilot was originally built on ChatGPT, however, recently, Microsoft has integrated technology from Claude and started working on its own internal LLMs. Microsoft has included numerous versions of Copilot across its various consumer and enterprise applications, each with different features and use cases. Copilot has a "freemium" model, which permits use of certain features free of charge, but premium features and capabilities for consumers and businesses are behind a paywall, which the Company calls paid "seats."

42. During the Relevant Period, the Company's management has highlighted the purported success of Copilot and Microsoft's foray into AI development, claiming that Copilot offered best-in-class capabilities and enjoyed widespread user adoption. Microsoft leadership also downplayed concerns about the Company's AI investments and business dealings with LLM providers and other companies, claiming Microsoft was well positioned to achieve suitable returns on its AI-related investments and emerge as a key benefactor from the technological advancements.

43. In September 2023, Open AI was sued for copyright infringement by numerous authors and copyright holders – the *Authors Guild* case. In December 2023, Microsoft was added

as a Defendant in an amended complaint. The Authors Guild Complaint alleges that: (1) Microsoft and OpenAI copied hundreds of thousands copyrighted books without permission to train the GPT LLMs; (2) Microsoft, in addition to investing billions of dollars in Open AI, also provided Azure supercomputing infrastructure, integrated GPT into Bing Chat and Copilot, and shared in the commercial exploitation of the models and thus, the misappropriation of the copyrighted works; and (3) the LLMs can generate summaries and passages derived from the copyrighted books, diminishing the market for licensed works. The Authors Guild Complaint seeks certification of a nationwide class and asserts claims for copyright infringement, among other causes of action.

44. *Basbanes* was filed in January 2024 and brought claims regarding nonfiction works. Similarly, the Basbanes Complaint alleges that Microsoft: (1) copied plaintiffs' books to train LLM without permission or licenses; (2) was an active participant in the violations rather than a mere passive investor; and (3) its commercial products exploit the infringing LLMs. The Basbanes Complaint seeks statutory damages, actual damages, disgorgement of profits and injunctive relief preventing further use of copyrighted books.

45. On June 24, 2025, *Bird* was filed against Microsoft by numerous authors. The Bird Complaint alleges that Microsoft: (1) copied nearly 200,000 pirated books; (2) used those books to train the Megatron AI models; and (3) infringed the copyrights by reproducing and using the works without permission or licenses. The Bird Complaint seeks statutory damages and injunctive relief.

46. In June 2026, *Richner* was filed by nearly 400 U.S. print and digital newspaper publishers against Microsoft. The Richner Complaint alleges that Microsoft: (1) crawled publisher websites including content behind paywalls; (2) copied articles, stories and original works onto their own servers; (3) stripped copyright management information, such as author credits,

publication names, and copyright notices), before using the content to train AI LLMs; and (4) the LLMs would product the content verbatim or near-verbatim in response to user prompts allowing them circumvent paywalls.

47. Each of the Complaints allege that Microsoft was not a passive investor in the scheme, but instead an active participant. They allege that Microsoft invested more than $10 billion into OpenAI, supplied the Azure infrastructure used to train the LLMs, helped develop and deploy GPT-based AI systems, markets and products from LLMs such as Microsoft Copilot, and knew that copyright works were being used for training without permission or licenses. Accordingly, the Complaints assert that Microsoft has primary, not secondary, liability due to its role in the development and commercialization of the LLMs and AI systems. Due to the scale of these lawsuits and the allegations therein, the Defendants must have been aware of alleged, pervasive violations of copyright and intellectual property laws.

48. In addition to this knowledge related to Microsoft's specific violations, the Defendants failed to act in response to numerous red flags. For instance, on June 23, 2025, in *Bartz v. Anthropic*, No. 3:24-cv-05417-WHA (N.D. Cal.), the Court issued an order holding that there was a substantial distinction between training AI systems on legally acquired books and data on the one hand and training AI systems on pirated books and data on the other. The Order in Bartz reached two key conclusions: (1) training on lawfully acquired books was "exceedingly transformative" and could qualify for the fair use exception under 17 U.S.C. § 107; and (2) downloading and maintain a database of millions of pirated books was not a protected fair use and infringement claims based on those copies would proceed to trail. Even following the Order in *Bartz*, the Defendants failed to correct Microsoft's misconduct and ensure compliance with the law and instead permitted the unlawful activity to go on unchecked.

49. The Director Defendants had direct oversight responsibility at Microsoft and given the scale of its involvement, including multi-billion dollar investments in OpenAI and Anthropic, this was not an instance where they could be passive with their responsibilities. With respect to OpenAI, Microsoft stands to recoup its investment through a large share of OpenAI Global's profits and will retain a substantial equity interest in OpenAI even after the initial investment is recouped. Indeed, Microsoft's involvement extended well beyond multi-billion dollar investments, the Company has been a commercial partner in co-developing and co-designing including participation in the creation, training, deployment, and monetization of the infringing AI systems.

50. Under the Director Defendants' supervision and pursuant to their approval, Microsoft designed and built a bespoke Azure supercomputing environment essential to OpenAI. The Company then collaborated with Open AI to engineer the infrastructure. OpenAI and Microsoft worked together to optimize the Azure supercomputing environment for training LLMs on internet-scale datasets and Microsoft continues to operate that infrastructure for both training and inference. Accordingly, during the Director Defendants' tenure and pursuant to their direct oversight, Microsoft knowingly designed and operated the infrastructure used to ingest and process the copyrighted materials.

51. Microsoft developed the cloud infrastructure "in collaboration with and exclusively for OpenAI" and specifically designed it to use "essentially, the whole internet" to trin the LLMs. As a result, the Director Defendants knew or recklessly disregarded that pirated copyrighted material was being used to train the LLMs.

52. As the Relevant Period progressed and at Defendants' direction, Microsoft continued to expand its partnership with OpenAI. On October 28, 2025, Microsoft and OpenAI

announced the “next phase” including that Open AI restructured as a for-profit public benefit corporation with Microsoft retaining a 27% stake on an as-converted diluted basis and OpenAI agreeing to purchase $250 billion of incremental Azure services.

53. On November 18, 2025, Microsoft continued its AI integration efforts, announcing a strategic partnership with Anthropic and chip manufacturer NVIDIA Corp. whereby Microsoft would invest up to $5 billion in Anthropic and use Claude, in part, to power its in-house AI products and services, while Anthropic committed to purchasing $30 billion of Azure computer capacity and up to one gigawatt of additional capacity from Microsoft.

54. Defendants repeatedly touted the purported success of the Company’s AI development efforts along with claiming that Copilot offered best-in-class capabilities while experiencing widespread growth in user adoption. At the same time, Defendants downplayed concerns about the AI investments and partnerships with LLM providers and other companies by touting that Microsoft was well-positioned to achieve suitable returns on its AI-related investments and would emerge stronger, a benefactor from AI technological advancements. As a result, the Company’s stock price reached an intraday all-time high of $551.05 per share on July 31, 2025.

**THE DEFENANTS CAUSED MICROSOFT TO MAKE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE RELEVANT PERIOD**

55. On October 24, 2024, Microsoft filed its 2024 Proxy Statement with the SEC and distributed it to shareholders ahead of the Company’s 2025 Annual Meeting, held on December 10, 2024. The 2024 Proxy Statement was reviewed and approved by the Defendants. The 2024 Proxy stated with respect to “AI Strategy, Governance, and Regulation” that “[t]he Board maintains direct oversight over AI strategy risk” and that the Company’s “Environmental, Social and Public Policy Committee … receives and provides feedback on regular updates from

management regarding Microsoft's ability to design, build, and use AI in a way that meets regulatory expectations."

56. The 2024 Proxy Statement also included shareholder proposals, specifically Proposals 7, 8, and 9, which expressed concerns regarding the risks of generative AI including, among others, liability risks and AI data sourcing accountability. Proposal 9 specifically raised the concern that: "Microsoft employes generative AI models developed by OpenAI, which allegedly stole large amounts of personal information by scraping the web, including private information and private conversations, medical data, information about children – essentially every piece of data exchanged on the internet it could take – without notice to the owners or users of such data, much less with anyone's permission." Further, the proposal specifically mentioned that "Microsoft and OpenAI have been sued by [T]he New York Times, among others, which alleged copyright infringement." The proposal also stated that "Prioritizing data ethics in Microsoft's AI development may help avoid harmful fiduciary and regulatory consequences. Americans surveyed by Pew Research Center have expressed that data privacy and usage are among their concerns with Big Tech's AI initiatives."

57. However, the Director Defendants recommended voting against these proposals, declaring that the proposals were unnecessary because Microsoft's "Responsible AI" frameworks and existing transparency reports rendered the proposed actions unnecessary. The 2024 Proxy Statement also represented that Microsoft's AI programs are operated in "a manner consistent with global copyright laws" and that AI training occurs "on data that we gain access to (such as archives and metadata) through negotiated arrangements with publishers and copyright owners."

58. In opposition to Proposal 9, the Director Defendants approved the Company's representations that Microsoft respects standards like robots.txt and tags such as NO ARCHIVE.

Further, Microsoft represented that it shared controls for website owners to opt-out of having their content used in connection with AI training and affirmed that its compliance with the EU AI Act, which will require publishing detailed summaries of training content beginning in August 2025.

59. After the market closed on April 30, 2025, Microsoft issued a press release providing its financial results for the third fiscal quarter of 2025 ("Q3 2025"). In the release, the Company reported $26.8 billion in Intelligent Cloud revenue, a 21% increase, "driven by Azure and other cloud services revenue growth of 33%." In the release, Defendant Nadella stated: "Cloud and AI are the essential inputs for every business to expand output, reduce costs, and accelerate growth . . . From AI infra and platforms to apps, we are innovating across the stack to deliver for our customers."

60. On the same date, Microsoft filed its Form 10-Q concerning its Q3 2025 results with the SEC, which was signed by Defendants Nadella and Hood, who certified and attested to the filing's accuracy and completeness. The financial results contained therein mirrored the press release concerning the Q3 2025 financial results. Additionally, the Form 10-Q stated: "Azure and other cloud services revenue grew 33% driven by demand for our portfolio of services, including 16 points from our AI services."

61. Also on that date, Microsoft hosted an earnings conference call with analysts and investors to discuss the Q3 2025 financial results hosted by Defendants Nadella and Hood. Therein, Defendant Nadella stated that Microsoft "continue[s] to win new customers with best-in-class AI capabilities." Specifically, Defendant Nadella highlighted advancements in Copilot and its growing adoption by consumers and businesses alike, stating that "***Microsoft 365 Copilot is built to facilitate human agent collaboration, hundreds of thousands of customers across geographies and industries now use Copilot up 3 times year-over-year. Our overall deal size***

***continues to grow. In this quarter, we saw a record number of customers returning to buy more seats.*** And we're going further. Just last week, we announced a major update, bringing together agents, notebooks, search and create into a new scaffolding for work." Furthermore, Defendant Nadella elaborated on how Microsoft's "new researcher and analyst deep reasoning agents analyze vast amount of web and enterprise data to deliver highly skilled expertise on demand directly within Copilot."

62. Defendant Hood likewise stated that: "We continue to see strong demand for our cloud and AI offerings as they help customers drive productivity, increase efficiencies and grow their businesses." Defendant Hood touted the purported success of Copilot, stating: "ARPU growth was again driven by E5 and M365 Copilot." Defendant Hood further represented that the Company "continue[s] to see growth across customer segments and geos" with respect to Microsoft365 Copilot and referenced 7% year-over-year growth to over $430 million on "Paid M365 Commercial seats." Defendant Hood also touted "installed base expansion across all customer segments."

63. On July 30, 2025, the Company issued a press release announcing its financial results for the fourth fiscal quarter and year ended June 30, 2025 ("FY 25"). Therein, Microsoft reported generating $29.9 billion in Intelligent Cloud revenue, a 26% increase, "driven by Azure and other cloud services revenue growth of 39%." In the press release, Defendant Nadella was quoted as stating: "Cloud and AI is the driving force of business transformation across every industry and sector . . . We're innovating across the tech stack to help customers adapt and grow in this new era, and this year, Azure surpassed $75 billion in revenue, up 34 percent, driven by growth across all workloads."

64. On the same date, Microsoft filed its 2025 Annual Report on Form 10-K with the SEC. Defendants Nadella and Hood signed and certified the accuracy of the filing's accuracy and material completeness. The Form 10-K contained the same financial information regarding Microsoft's Azure and Intelligent Cloud offerings contained in the press release. Microsoft also stated in the Form 10-K that: "Azure and other cloud services revenue grew 34% driven by demand for our portfolio of services."

65. Also on that date, the Company hosted an earnings conference call with analysts and investors to discuss the Company's FY25 financial results hosted by Defendants Nadella and Hood. During the call, Defendant Nadella stated that Microsoft was experiencing "record" enthusiasm for its Copilot products. Specifically, Defendant Nadella stated that "[w]ith this innovation and continued product improvements we are seeing real momentum[]" as "[c]ustomers continue to adopt Copilot at a faster rate than any other new Microsoft 365 suite, with ***strong usage intensity as shown by our week-over-week retention.***" Defendant Nadella touted "the largest quarter of seat adds since launch with record number of customers returning to buy more seats."

66. On September 10, 2025, Defendant Spataro presented at the Goldman Sachs Communcaopia & Technology Conference and spoke extensively about the purported benefits of Copilot and its adoption by customers, claiming "we feel great about what we can do" through Copilot to "improve efficiency by 20% to 30%." He outlined several "real nuts and bolts" examples of real world efficiency and affirmed that "at Microsoft, we're saving a lot of money, and we see our customers doing it as well." Further, when queried about how "Copilot usage tracked relative to your expectations," Defendant Spataro replied that Copilot "still is our fastest growing M365 portfolio product that we've ever had. And that's saying something because M3 and ME 5, like those are big important products that continue to really grow."

67. On October 21, 2025, the Company filed its 2025 Proxy Statement with the SEC and distributed it to shareholders ahead of the Company's 2026 Annual Meeting, held on December 5, 2025. The 2025 Proxy Statement was reviewed and approved by the Defendants. The 2025 Proxy Statement again stated with respect to "AI Strategy, Governance, and Regulation" that "[t]he Board maintains direct oversight over AI strategy risk" and that the Company's "Environmental, Social and Public Policy Committee assists the Board in overseeing Microsoft's AI governance and regulation risk and provides oversight and guidance on Microsoft's responsible AI policies and programs" and "receives and provides feedback on regular updates from management regarding Microsoft's ability to design, build, and use AI in a way that meets regulatory expectations."

68. The 2025 Proxy Statement touted the Company's "leadership in artificial intelligence" and stated that the Officer Defendants had position the Company as a "clear artificial intelligence leader." Further, the 2025 Proxy Statement purportedly confirmed that Microsoft was not violating any federal copyright laws in connection with the development and training of its AI software, generative models and products, stating:

- "Generative AI Models – Microsoft uses a variety of data sources, including publicly available information, in a manner consistent with global copyright laws."
- "We do not train on data from domains listed in the Office of the United States Trade Representative Notorious Markets for Counterfeiting and Piracy List."
- "We train on data that we gain access to (such as archives and metadata) through negotiated arrangements with publishers and copyright owners."

69. The 2025 Proxy Statement proclaimed that the "family of Copilot apps" surpassed 100 million monthly active users and Copilot Studio had surpassed 230,000 organizational users.

The 2025 Proxy Statement touted the launch of Azure AI Foundry, which helps "customers design, customize, and manage AI applications and agents at scale, supporting more than 70,000 customers, including 80% of the Fortune 500."

70. In the 2025 Proxy Statement, Microsoft emphasized its massive spending was focused on building an "AI-first platform." In fiscal year 2025, the Company stated that it had invested more than $88 billion in capital expenditures to "support customer demand signals" and added over two gigawatts of capacity.

71. The 2025 Proxy Statement stated that the Board receives regular updates on product performance and resiliency as part of its direct oversight over "Software and Services Quality and Availability." The Company also touted the "best-in-class developmental tools" offered by Azure AI Foundry.

72. The 2025 Proxy Statement also contains representations that Defendant Nadella was successfully driving Microsoft's AI strategy pursuant to his "thoughtful leadership" and that warranted awarding Nadella a high operational performance rating (151.67% payout).

73. The 2025 Proxy Statement included proposals (Proposals 5, 6, & 7) concerning the risks of generative AI, including reports on GenAI bias, censorships risk and data usage oversight. Proposal 7 stated that: "Microsoft employs generative AI models developed by OpenAI, which allegedly stole large amounts of personal information by scraping the web, including private information and private conversations, medical data, information about children – essentially every piece of data exchanged on the internet it could take – without notice to the owners or users of such data, much less with anyone's permission." Proposal 7 also explained that "Microsoft and OpenAI have been sued by the New York Times, among others, which alleged copyright infringement."

74. The Director Defendants once again levied their objection and recommended that shareholders vote against these proposals, citing again the Company's "Responsible AI" frameworks and existing transparency rendering the proposals superfluous. The Director Defendants also reinforced that the Company conducts and operates its AI business in "a manner consistent with global copyright laws" and that "[w]e train on data that we gain access to (such as archives and metadata) through negotiated arrangements with publishers and copyright owners."

75. To further their efforts to have shareholders reject Proposal 7, the Director Defendants approved the Company's representations that Microsoft respects standards like robots.txt and tags such as NO ARCHIVE. Further, Microsoft represented that it shared controls for website owners to opt-out of having their content used in connection with AI training and affirmed that its compliance with the EU AI Act, which will require publishing detailed summaries of training content beginning in August 2025. The Company also represented that: "[d]uring fiscal year 2025, we approached investors holding over 35% of Microsoft's shares to discuss our practices and the status of different legal frameworks around the world that relate to training AI models." The Company also noted its engagement with the National Legal and Policy Center (the proponent of shareholder proposals regarding AI data ethics) between late 2024 and May 2025 in the interests of transparency.

76. On October 29, 2025, Microsoft issued a press release announcing its financial results for the first fiscal quarter of fiscal year 2026 ("1Q26"). Therein, the Company reported quarterly Intelligent Cloud revenue of $30.9 billion, a 28% increase, with Azure and other cloud services revenue increasing 40%. Defendant Nardella was quoted in the press release as stating: "Our planet-scale cloud and AI factory, together with Copilots across high value domains, is driving broad diffusion and real-world impact . . . It's why we continue to increase our investments

in AI across both capital and talent to meet the massive opportunity ahead." Defendant Hood stated: "[W]e delivered a strong start to the fiscal year, exceeding expectations across revenue, operating income, and earnings per share . . . Continued strength in the Microsoft Cloud reflects the growing customer demand for our differentiated platform."

77. On that same date, Microsoft filed its Form 10-Q for 1Q26. Defendants Nadella and Hood signed and certified the accuracy of the filing's accuracy and material completeness. The Form 10-Q reported the same financial information disclosed in 1Q26 press release. The Form 10-Q disclosed that the revenue growth in Azure and other cloud services revenue was "driven by demand for our portfolio of services with continued growth across all workloads."

78. Also on that date, Microsoft hosted an earnings conference call with analysts and investors to discuss the Company's 1Q26 financial results hosted by Defendants Nadella and Hood. During the call, Defendant Nadella addressed the recently restructured partnership with OpenAI and the Company's purportedly best-in-class AI capabilities. Specifically, Nadella stated with respect to the Company's "momentum across our AI platform and Copilots[,] as well with agents," that Microsoft has "the most expensive data center fleet for the AI era" and is "adding capacity at an unprecedented scale." According to Defendant Nadella, "[w]e will increase our total AI capacity by over 80% this year and roughly double our total data center footprint over the next two years, reflecting the demand signals we see." Defendant Nadella also represented that Microsoft was "optimizing this fleet across silicon systems and software to maximize performance and efficiency."

79. Defendant Nardella also spoke on the call about the purported demand and capabilities of Copilot, calling Copilot "best-in-class" according to multiple third-party benchmarks. Further, Defendant Nadella continued to tout "increasing demand and diffusion of

our AI platform and family of Copilots, which is fueling our investments across both capital and talent." Defendant Nadella declared that "Copilot is becoming the UI for the agentic AI experience with the integration of "chat and agentic workflows into everyday tools like Outlook, Word, Excel, PowerPoint and Teams." Again, Defendant Nadella touted the number of commercial seats specifically naming certain customers:

> ***All this innovation is driving our momentum. Customers continue to adopt Microsoft 365 Copilot at a faster rate than any other new Microsoft 365 suite, all up more than 90% of the Fortune 500 now use Microsoft 365 Copilot, Accenture, Bristol-Myers Squibb, EY Global and the UK's Tax and Payments and Customs Authority all purchased over 15,000 seats this quarter. Lloyds Banking Group has deployed 30,000 seats, saving each employee an average of 46 minutes daily.***
>
> ***And a large majority of our enterprise customers continue to come back to purchase more seats. Our partner, PwC, alone added 155,000 seats this quarter and now has over 200,000 deployed across its global operations. In just six months, PwC employees interacted with Microsoft 365 Copilot over 30 million times, and they credit this identic transformation with saving millions of hours in employee productivity.***

80. Then, on December 2, 2025, Defendant Jha presented at the UBS Global Technology and AI Conference. When asked about the consumer adoption Copilot, Defendant Jha commented that the "intensity" of the usage of Copilot is increasing, and touting that "two quarters in a row, the daily active user engagement with Copilot has more than doubled, quarter over quarter[,]" which, according to Defendant Jha, "is a real sign of [a] product with increased intensity of usage and more users engaging with the Copilot experience." Defendant Jha also labeled Copilot as a "contributor" to "[t]he fact that our ARPU growth has been stable."

81. When queried about Copilot's trajectory, Defendant Jha explained that Microsoft was already doing several "things that are already elevating the capabilities of Copilot." Defendant Jha first pointed to "unlock[ing] AI and graphical user interfaces to work much more effectively[]"

and for example, "agent mode inside of Office, inside of Excel, insider of Word, inside of PowerPoint, in your calendar, in your meeting, insider your Teams Channel." Next, Defendant Jha emphasized "enabling more Agentic workflows" with "Agent 365" functioning as part of "a governance and compliance plan enabl[ing] customers to go without the worry of a sprawl or management on their hands." Lastly, Defendant Jha elaborated on bringing "multiple sources of intelligence into Copilot" and explained "[i]t's about how the models come together with the graphical interface, the innate capabilities of the models, multiple lineages of the model to actually deliver the outcome or the workflow that you're planning to go do, whether in our applications or agents that you will build on your own."

82. Regarding competitive threats to Copilot, such Google's Gemini, Defendant Jha stated that Microsoft needed to "make sure we meet users' expectations with what they expect Generative AI to do: be a great writer, be a great analyzer, be able to tell you the weather, create an image and all of that stuff" and declared that Microsoft is "going to do that[]" and "be competitive like any other Gen AI tool on that." Defendant Jha stated that "customer who've done side-by-side analysis of Copilot in the context of your work and connector-based things and the gap is very significant and growing." Defendant Jha reiterated that "Copilot is going to be UI through which they orchestrate the agent[]" serving as "the search engine" and "relevance engine for these agents."

83. On December 5, 2025, Defendants Nadella and Hood, among other members of the Microsoft executive team, hosted the Microsoft Annual Shareholders Meeting. During the meeting, Defendant Nadella discussed the "major advances in AI innovation" in the Company's "family of Copilots." Defendant Hood echoed these sentiments, highlighting Microsoft's "best in class AI capabilities."

84. Other executives likewise reinforced these statements. For example, Microsoft 365 Copilot Director Callie August represented that "Copilot doesn't just access your work data, it actually understands it." According to August, Copilot has "work IQ" meaning "the intelligence layer behind Microsoft 365 Copilot and agents that helps Copilot understand you, your job and your company. This enables Copilot to give you more accurate, relevant, and personalized responses."

85. Defendant Nadella emphasized that Microsoft's cloud infrastructure was already AI-ready and expanding. Specifically, Defendant Nadella stated, that the number one priority was "our infrastructure business, one of the great opportunities we now get is to build our cloud interface so that its AI ready for what is going to be the token factories or the intelligence factories" and represented that "[w]e're obviously at scale and building out rapidly

86. The statements identified and referenced in ¶¶ 55-85 above were materially false and misleading when made because they materially misled investors about and/or failed to disclose the following adverse facts about Microsoft's business, operations, and financial condition and outlook, which were known to Defendants and/or recklessly disregarded by them at that time:

a. Microsoft's AI strategy and partnerships, such as with OpenAI, were dependent upon repeated commission of violations of federal copyright laws;

b. Microsoft's Copilot software had experienced and was experiencing major issues with brand positioning, user experience, usage, data siloing, computational capacity, organizational and interoperability;

c. Microsoft's proprietary AI model was trailing competitors by a wide margin in a number of benchmarks;

d. To improve the competitive positions of its lagging Copilot software and improve its AI-related research and development ("R&D"), Microsoft needed to increase capital expenditures by billions of dollars and divert Computer Processing Units ("CPU") and Graphics Processing Units ("GPU") capacity away from satisfying demand for its profitable Azure services;

e. As a result of the above, Microsoft had failed to convert a significant of commercial Microsoft 365 users to paid Copilot subscriptions and accordingly, the Company's Copilot products and services had lost market share to rival products, a trend that was increasing.

87. Defendants were also required pursuant to Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303") to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Likewise, Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105 ("Item 105") required "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and that each such risk factor "adequately describe[] the risk."

88. Microsoft's SEC filings failed to disclose the issues identified herein regarding the development and customer adoption of Copilot products and Microsoft's proprietary AI models and accordingly, Item 303 was violated because these undisclosed facts were known to Defendants and would (and did) have an unfavorable impact on the Company's sales, revenues, income from continuing operations and outlook. Additionally, Item 105 was also violated because these undisclosed adverse facts created significant risks that were not adequately disclosed even though they were paramount evaluating whether an investment in Microsoft stock was speculative or risky. The existing risk disclosures were materially misleading, presenting realized risks as mere hypotheticals, while Defendants concealed adverse information regarding the Company's Copilot products and services and other AI-related offerings that had already occurred and made affirmative, material misrepresentations about the same products and services.

**The Truth Emerges**

89. On January 28, 2026, Microsoft announced disappointing financial results for the second quarter of fiscal year 2026 ("Q2 2026"). Microsoft reported that Azure growth slowed

suddenly and had fallen below analyst expectations in Q2 2026. During the associated earnings call, Defendant Hood clarified that Azure's growth slowing down was primarily caused by computational capacity constraints that arose from the Company diverting CPU and GPU capacity to Copilot applications and AI-related R&D.

90. Second, Microsoft revealed that capital expenditures ballooned to $37.5 billion during the quarter, causing capital expenditures for the first six months of fiscal 2026 to increase to $72.4 billion, a staggering figure considering that capital expenditures were just $88.2 billion for the full 2025 fiscal year. The stunning increase in capital expenditures was again primarily pinned on Copilot development and capacity buildout costs, as well as AI-related R&D.

91. Third, Microsoft disclosed, for the first time, that Microsoft was failing to convert commercial users into paid Microsoft Copilot seats. Specifically, Microsoft revealed that it had only 15 million paid Microsoft 365 Copilot seats, materially below analyst estimates and a mere fraction of the more than 450 million commercial users.

92. On this news, Microsoft shares declined over $48 per share from a January 28, 2026, closing price of $481.63 per share, down to $433.50 per share at market close on January 29, 2026, on unusually heavy trading volume of nearly 129 million shares.

93. Then, on February 3, 2026, *The Wall Street Journal* published an article entitled "Microsoft's Pivotal AI Product is Running into Big Problems" and therein, reported Microsoft's Copilot offerings had been plagued with functionality issues and severe challenges, which had caused Microsoft to lose market share to competing products such as Google's Gemini. According to the article, "[c]onfusing brand positioning and interoperability problems have frustrated users, current and former employees who have worked on Microsoft's AI products said" and that "[o]nly a small proportion of subscribers to Microsoft's enterprise suite use Copilot, and the percentage

that favor it over Google's Gemini or other tools has decreased in recent months." The article reported the following, in detail:

> Previously unreported data shows that Copilot subscribers, including those with corporate accounts, are increasingly favoring competing options.
>
> From last July through late January, the percentage of Copilot subscribers who use the product as a primary option decreased from 18.8% to 11.5% according toa survey of more than 150,000 respondents in the U.S. by market research firm Recon Analytics. This happened while the share of paid users who choose Google's Gemini as the first option increased from 12.8% to 15.7%.
>
> * * *
>
> Those surveyed who switched from Copilot said they found better quality elsewhere, with some citing poor user experience and restrictive usage limits. Workers who have access to subscriptions for Copilot, ChatGPT and Gemini choose ChatGPT and Gemini at a higher rate than Copilot, the Recon data shows.
>
> Some companies are using only about 10% of the Copilot subscription seats they are paying for, according to a recent note by analysts at Citi Research. "Disorganized data silos" have been an issue for Copilot, analysts wrote.
>
> * * *
>
> Customer surveys by Microsoft have shown that users have been confused by multiple versions of Copilot, people familiar with the matter said. Some users have long complained about Copilot being forced onto them, popping up on everything from documents to the browser.
>
> One issued cited by current and former employees is the lack of a cohesive experience across the different Copilots, a user pain point Nadella has flagged in the past. About a year ago, Nadella sent a frustrated email to Rajesh Jha, executive vice president of experiences and devices, detailing an incident in which Nadella had asked the enterprise version of Copilot on the Edge browser to help with a public webpage he was on, but it couldn't fulfill his prompt, according to people familiar with the email.
>
> * * *

> Some employees said an organizational silo between Suleyman's consumer-focused team and teams working on enterprise versions has made it challenging to achieve a unified vision.
>
> The effort to train proprietary models has also been hampered by a shortage of computing capacity, with the company rationing server time to ensure availability for OpenAI and other customers of its Azure cloud service. On a number of benchmark tests, Microsoft's flagship proprietary AI model ranks well below competitors.

94. Microsoft's stock price continued to decline in the days following the 2Q 2026 earnings announcement as this additional news came to light with the Company's stock price falling beneath $393 per share on February 5, 2026.

95. Then, on February 11, 2026, Melius Research LLC ("Melius") published a research note that labeled Microsoft's decision to divert Azure capacity to fix the flaws in Copilot products as a "no-win situation," which was likely to hamper the Company in the foreseeable future. The Melius analyst explained that "the better the AI assistants get from competitors, the more Microsoft will seem behind in Copilot and its other AI tools – and then will need to spend more to invest in them, consuming the upside in Azure for their own purposes."

96. On March 17, 2026, *The Wall Street Journal* published an article entitled "Microsoft Seeks More Coherence in AI Efforts with Copilot Reorganization," which reported that Microsoft was reorganizing its Copilot product teams to unify the commercial and consumer versions in response to the developmental and customer adoption challenges.

97. On this news, Microsoft's stock price dropped to a low of just $380 per share on March 20, 2026, which was 30% below the Relevant Period high.

98. On April 29, 2026, the Company announced results for its third quarter of fiscal year 2026 ("Q3 2026"). During earnings call to discuss Q3 2026 financial results, Defendant Hood

disclosed that the Company had increased its planned capital expenditures for calendar year 2026 to $190 billion, $37 billion more than analyst expectations.

99. On May 25, 2026, Greenwich Research issued a report entitled "Detailed Analysis of Microsoft's Q2 2026, and therein, cautioned that "[i]nvestors must comprehensively weigh the transformative economic potential of AI integration against the possibilities of consumer backlash, copyright litigation, or statutory liability that could abruptly slow the 123% year-over-year increase in the AI revenue run rate."

100. On June 2, 2026, Evercore hosted Microsoft's CFO of Commercial Products and Infrastructure Mat McBride ("McBride") at its TMT Conference. In response to a query regarding customer dissatisfaction with Copilot, McBride stated that Microsoft was working to "improve[] the product rapidly over the last year," which included the launch of "625 new features," such that the "product is way different than it was 90 days ago."

101. Despite the catch-up efforts and purported improvements, Copilot has continued to lose market share according to third-party tracking services. For example, according to First Page Sage, which describes itself as "an SEO and thought leadership marketing company with offices throughout the U.S.," Copilot held an 8.7% market share among top generative AI chatbots in June 2026, down significantly from Copilot's 14.3% market share in June 2025 as measured by the service. According to First Page Sage, during this time period Copilot fell from the second most used generative AI chatbot by market share to the fourth most used generative AI chatbot.

102. On June 9, 2026, Washington Analysis published a report entitled "[OpenAI, Anthropic, MSFT]] OpenAI IPO: Regulatory Exposure Extends Beyond Frontier AI Oversight" and therein, reported that "[w]hile many AI companies face copyright disputes, we believe OpenAI's sits at the center of the highest profile litigation involving publishers, authors and

content owners." Further, the report states that "[t]he risk goes beyond litigation costs, as future settlements, licensing arrangements, or judicial outcomes could establish an economic framework governing access to training data across the entire industry." The report also highlights that "OpenAI's relationship with Microsoft (MSFT) introduces a regulatory dimension that has no true analogue" and that "[a]s AI becomes increasingly embedded throughout enterprise technology, regulators could examine whether Microsoft's relationship with OpenAI confers competitive advantages unavailable to rivals."

103. On July 20, 2026, the scale of Microsoft's potential liability came further into view when *Reuters* reported final approval of a landmark $1.5 billion settlement in a class action lawsuit brought by a group of authors against Anthropic for misuse of their books to train Claude.

**ALLEGATIONS REGARDING DEFENDANTS' KNOWLEDGE OR RECKLESSNESS**

104. As is alleged herein, Defendants either knew or recklessly disregarding the materially misleading representations in and material omissions from the Company's public documents and statements they issued or disseminated during the Relevant Period. Defendants knowingly participated in and/or acquiesced to the issuance and dissemination of such false and misleading statements and documents. By virtue of their receipt of information reflecting the truth facts, as well as their control over and ability to modify Microsoft's public statements and documents, Defendants were active and culpable participants in the wrongdoing alleged herein.

105. Defendants knew and/or recklessly disregarded the false and misleading nature of the statements and documents that they caused to be disseminated to investors. As a result, the false and misleading statements alleged herein could not have been made during the Relevant Period without the knowledge and complicitly of, or minimally, the reckless disregard of, the Defendants.

106. Defendants, by way of their positions within Microsoft, controlled the contents of the Company's public statements and filings during the Relevant Period. The Individual Defendants were each provided with or had access to the information alleged to be false and/or misleading prior to or shortly after the issuance to the investing public and had the ability, opportunity and authority to prevent its issuance or amended to correct the information that was false and/or misleading therein. As a result of their positions and access to material, non-public information, Defendants were privy to and had knowledge of and/or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from investors and that the positive representations made were materially false and misleading. As a result, each of the Defendants was and is responsible for ensuring that Microsoft's corporate statements were and are accurate and not false or misleading, and is, thus, responsible and liable for the misrepresentations contained therein and alleged herein.

107. The Company's Proxy Statements acknowledge and admit that the Board exercised direct oversight with respect to the Company's AI strategy and frequently met with management concerning development, implementation, and progress with respect to the strategy. *See e.g.,* 2023 Proxy Statement at p. 9: "For major initiatives, such as our approach to AI, the Board engages with management on strategic vision, investments, partnerships, capital requirements, and risks." The 2024 and 2025 Proxy Statements each reiterated that "[t]he Board maintains direct oversight over AI strategy risk."

108. The Board's Environmental, Social and Public Policy Committee also had responsibilities related to the Company's AI strategy. Specifically, as reflected in the 2023 Proxy Statement, the "Environmental, Social and Public Policy Committee provides oversight and guidance to management on responsible AI policies and programs." Both the 2024 and 2025 Proxy

Statements represented that "[o]ur Environmental Social and Public Policy Committee assists the Board in overseeing Microsoft's AI governance and regulation risk and provides oversight and guidance on Microsoft's responsible AI policies and programs." During the Relevant Period, Defendants Pritzker (Chair), Hoffman, Stanton, Walmsley, and MacGregor served on this committee.

109. In addition, the Defendants were each personally involved in the development or supervision of Microsoft's Copilot offerings and/or customer adoption. The Defendants repeatedly held themselves out as the Microsoft executives most knowledgeable and competent to speak on topics during discussions with investors, analysts, and media. For instance, during Defendant McBride's June 2026 Evercore interview, he described how the executive team, including and led by the Officer Defendants, methodically developed and oversaw Microsoft's AI infrastructure buildout in consultation with the Board. Furthermore, as reflected in *The Wall Street Journal* articles, the Defendants were personally and directly involved in identifying and implementing remediation efforts addressing the Copilot problems, and yet, they failed to disclose the issues promptly or accurately to the market. Worse, Defendants continued to make materially false and misleading statements about the Company's AI programs, products, and services. Accordingly, there is a compelling inference each Defendants knew or was reckless in not knowing of their materially false and misleading nature when each statement was made is at least as compelling as any non-culpable inference.

## **<u>DEMAND FUTILITY ALLEGATIONS</u>**

110. Plaintiff brings this action derivatively and for the benefit of Microsoft to redress the harm suffered and to be suffered as a result of the Defendants' breaches of their fiduciary duties as directors and/or officers of Microsoft, unjust enrichment, and violations of the Exchange Act.

111. Microsoft is a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

112. Plaintiff is, and has at all relevant times been, a shareholder of Microsoft. Plaintiff will adequately and fairly represent Microsoft's interests in enforcing and prosecuting its rights, and with that aim, has retained competent counsel.

113. Plaintiff incorporates by reference and realleges each and every allegation set for above, as though set forth fully herein.

114. Pre-suit demand on the Microsoft Board is and would be futile and therefore, is excused. When this action was commenced, the Board consisted of Nadella, Di Sibio, Hoffman, Johnston, List, MacGregor, Mason, Peterson, Pritzker, Rainey, Scharf, Stanton, and Walmsley (the "Demand Directors"). As Microsoft has thirteen directors, Plaintiff needs to allege that demand would be futile as to at least seven members of the Board at the time the action was filed.

115. The State of Washington follows Delaware law and applies a "three-part" test for assessing whether demand should be futile. *United Food & Commercial Workers Union v. Zuckerberg*, 262 A.3d 1034, 1057-58 (Del. 2021). With respect to each Demand Director, the test questions: "(i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand; (ii) whether the director would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand; and (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that is the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand." Id.

**A. The Demand Directors Face a Substantial Likelihood of Personal Liability for Their Role in the Direct Supervision of the $13 Billion Partnership with OpenAI**

116. Each Demand Director faces a substantial likelihood of liability for their direct participation in the wrongful conduct and/or breaching their oversight duties in bad faith.

117. Intellectual property rights are of paramount importance to Microsoft. Without copyright protection, Microsoft's software could be copied by competitors freely, would have no value, and the Company's revenues would collapse. Similarly, if Microsoft were to violate a competitor's intellectual property rights, it would expose the Company to substantial liability. Here, however, the situation that occurred under the watch of the Demand Defendants is far worse. Because Microsoft's own software and products were developed through and entrenched with rampant violations of intellectual property rights, the Company's recurring revenues from the software are at-risk and thus, the Company is not only exposed to damages from litigation, but could be faced with adverse impacts on revenue, profits and growth rate.

118. Eleven of the thirteen Demand Directors – Nadella, Hoffman, Johnston, List, MacGregor, Mason, Peterson, Pritzker, Scharf, Stanton and Walmsley – have been on the Board of Directors at all relevant times, including during the period when Microsoft committed copyright and intellectual property rights violations. All these Directors also made false and misleading statements during the Relevant Period and caused Microsoft to make stock repurchases. Accordingly, all eleven Demand Directors identified above are interested because they face a substantial likelihood of liability for each of the claims asserted herein.

119. Further, the same eleven Demand Directors failed to act on numerous red flags indicating that Microsoft was repeatedly violating copyright and intellectual property laws. Even following the June 23, 2025, Order in *Bartz v. Anthropic*, No. 3:24-cv-05417-WHA (N.D. Cal.), which made clear that training AI systems on pirated books and data was illegal, these Demand

Directors failed to cause Microsoft's compliance with the law and allowed the unlawful training to continue unchecked.

120. The Director Defendants knew or recklessly disregarded the unlawful copyright infringement. They were not mere passive participants instead, as made plain by the Company's public filings, they had direct oversight responsibility over Microsoft's multi-billion dollar investments and partnerships with OpenAI and Anthropic. Indeed, at all relevant times, Microsoft has been a co-developer, co-designer, and commercial partner in the creation, training, deployment and monetization of infringing AI systems. As a result of these massive investments, as well as the substantial partnerships, which are all highly material to Microsoft, the Director Defendants were personally and directly involved in all aspects of the Company's dealings with OpenAI and Anthropic.

121. Further, under the Director Defendants' supervision and pursuant to their approval, Microsoft designed and built a bespoke Azure supercomputing environment specifically for OpenAI. Pursuant to the Director Defendants' actions, Microsoft: (1) engineered the infrastructure in collaboration with OpenAI; (2) optimized the infrastructure to train LLMs on internet-wide scale datasets; and (3) continues to operate the infrastructure during both training and inference. The Director Defendants oversaw that the Company knowingly designed and operated the infrastructure, which was ingested and processed copyrighted material.

122. Microsoft's cloud infrastructure was designed to use "the whole internet" and was developed "in collaboration with and exclusively for OpenAI" to its LLMs. Accordingly, the Director Defendants knew or recklessly disregarded the fact that pirated books and data were used to train the AI models, systems and software.

123. Directors Nadella, Hoffman, Johnston, List, MacGregor, Mason Peterson, Pritzker, Rainey, Scharf, Stanton and Walmsley approved Microsoft's 2025 Proxy Statement, which contained false and misleading statements and omitted material information.

124. Thus, Directors Nadella, Hoffman, Johnston, List, MacGregor, Mason Peterson, Pritzker, Rainey, Scharf, Stanton and Walmsley consciously and repeatedly ignored red flags that Microsoft was engaging in pervasive violations of federal copyright and IP laws. As a result, the Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability for their wrong act, such that demand on the Board would be excused as futile.

**B. Each Demand Director Approved the Issuance of False and Misleading Public Statements And As a Result, Faces a Substantial Likelihood of Liability**

125. During the Relevant Period, Directors Nadella, Hoffman, Johnston, List, MacGregor, Mason, Peterson, Pritzker, Rainey, Scharf, Stanton, and Walmsley caused Microsoft to issue numerous false and misleading statements.

126. These directors bore ultimate responsibility for Microsoft's public disclosures. Directors Nadella, Hoffman, Johnston, List, MacGregor, Mason, Peterson, Pritzker, Rainey, Scharf, Stanton, and Walmsley approved at least one or more of the false and misleading statements identified herein.

127. The Director Defendants, together and individually, breached their fiduciary duties of loyalty and acted in bad faith. The Director Defendants knowingly approved and/or permitted the wrongful conduct alleged herein to occur and continue and caused the Company to infringe on protected copyrights and violate the law repeatedly. The Director Defendants also authorized and permitted the false statements to be disseminated to the public including Company investors and

they are principal beneficiaries of the wrongdoing and thus, could not and cannot fairly and fully prosecute the asserted causes of action.

128. Each Demand Director had actual knowledge of the undisclosed material facts alleged herein and knowingly or recklessly disregarded them in bad faith when approving the false and misleading statements made or filed on the Company's behalf. Similarly, the Director Defendants knew of the falsity of the misleading statements in the Company's public filings and statements. The Demand Directors knowingly or recklessly caused the Company to engage in illegal copyright infringement, and to issue the materially false and misleading statements alleged herein. The Director Defendants knowingly approved and/or permitted a business model premised on the training of the Company's products on copyrighted materials without a license or legal permission for use. Accordingly, the Director Defendants face a substantial likelihood of liability and are not disinterested for purposes of the demand futility.

**C. Defendant Nadella is Interested Based on Having Received Improper Financial Benefits**

129. Defendant Nadella served as the Company's CEO at all relevant times and is neither disinterested, nor independent. Defendant Nadella derived his sole employment income from Microsoft and as the Company's proxy statements concede, is not an independent director.

130. Defendant Nadella was awarded unjust compensation in the aggregate amount of $224,115,510 between 2023-25, as reflected below:

| **Year** | **Salary** | **Stock Awards** | **Non-equity Incentive Plan Compensation** | **All Other Compensation** | **Total** |
|---|---|---|---|---|---|
| 2023 | $2,500,000 | $39,236,137 | $6,414,750 | $361,650 | $48,512,537 |
| 2024 | $2,500,000 | $71,236,392 | $5,200,000 | $169,791 | $79,106,183 |
| 2025 | $2,500,000 | $84,245,496 | $9,555,000 | $196,294 | $96,496,790 |

131. As the Company's 2025 Proxy Statement admits, Defendant Nadella's compensation was out of proportion with every other employee of the Company. The 2025 Proxy Statement states that "For fiscal year 2025, the annual total compensation for the median employee of the Company (other than our CEO) was $200,972 and the annual total compensation of our CEO was $96,496,790. Based on this information, for fiscal year 2025[,] the ratio of the annual total compensation of our CEO to annual total compensation of the median employee was 480 to 1."

132. Defendant Nadella's massive, disproportionate compensation was unjust because he breached his fiduciary duties, issued false and misleading statements and used his capacity to manipulate the targets for his compensation. Defendant Nadella is therefore interested in the claims asserted and thus, demand is futile with respect to Defendant Nadella.

**D. Demand on the Audit Committee Directors Is Futile**

133. Defendant Johnston (Chair), List and Stanton served on the Audit Committee and accordingly, are neither disinterested, nor independent and are incapable of considering a demand. The Audit Committee Directors were responsible for assessing the adequacy and effectiveness of the Company's internal controls regarding compliance with federal copyright laws, information and technology security policies, cybersecurity and privacy related areas, compliance with related legal, regulatory and ethical requirements and public disclosure and financial reporting requirements. The Audit Committee Directors breached their fiduciary duties by allowing Microsoft to engage in pervasive copyright infringement and by failing to prevent and/or correct such violations after they occurred, those exposing Microsoft of substantial damages. Accordingly,

the Audit Committee Directors cannot independently consider a demand to sue themselves for breaching their fiduciary duties and violations of the 1934 Act.

**E. Demand on the Environmental, Social and Public Policy Committee Directors is Futile**

134. Microsoft's Proxy Statements during the Relevant Period acknowledged that the full Board possessed direct oversight responsibilities regarding the AI strategy and frequently met with the Company's management regarding the details of the strategy. For example, the 2023 Proxy Statement states "[f]or major initiatives, such as our approach to AI, the Board engages with management strategic vision, investments, partnerships, capital requirements, and risks." Accordingly, all eleven Director Defendants are implicated and interested with respect to the allegations herein.

135. Further, the Board's Environmental, Social, and Public Policy Committee also had responsibility with respect to Microsoft's AI strategy specifically with respect to reviewing and addressing responsible AI. The 2023 Proxy Statement note that the Committee "provides oversight and guidance to management on responsible AI policies and programs." Both the 2024 and 2025 Proxy Statements stated that: "The Board maintains direct oversight over AI strategy risk [and O]ur Environmental, Social and Public Policy Committee assists the Board in overseeing Microsoft's AI governance and regulation risk and provides oversight and guidance on Microsoft's responsible AI policies and programs."

136. Defendants Pritzker (Chair), Hoffman, MacGregor, Stanton, and Walmsley served on the Committee during the Relevant Period and accordingly, were responsible for the direct oversight of the Company's responsible AI strategy. Through the conduct alleged herein, these Defendants acted in bad faith with respect to such duties, including by issuing statements that represented that the Company was in full compliance with global copyright laws when they knew

or recklessly disregarding the falsity of such statements. These Defendants also repeatedly ignored red flags demonstrating that the Company was violating copyright protections and laws and failed to engage in a necessary inquiry in response to these red flags. As such, Defendants Pritzker, Hoffman, MacGregor, Stanton and Walmsley faced a substantial likelihood of liability. Demand is thus futile as to such directors.

**F. Demand is Futile for Additional Reasons**

137. The Director Defendants' conduct was based on bad faith and intentional, reckless, or disloyal misconduct and as a result, was not the product of legitimate business judgment. Accordingly, none of the directors can claim exculpation from the alleged violations of duty pursuant to the Company's charter. As all of the Director Defendants, who comprise eleven of thirteen Board members, face a substantial likelihood of liability, they are self-interested in the conduct challenged herein. The Director Defendants cannot be presumed capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the Company. Accordingly, the demand is excused as futile.

138. The acts alleged herein are violations of fiduciary duties owed by the Company's officers and directors, and these acts are incapable of ratification.

139. The Director Defendants are covered by Director & Officer ("D&O") insurance policies. D&O policies contain provisions that eliminate coverage for any action brought by Microsoft against the Individual Defendants, which is known as the "insured versus insured exclusion." As a result, if the Demand Directors sued themselves or certain officers of Microsoft, there would be no D&O insurance protection. By contrast, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to recover. Accordingly, the Board cannot be expected to file the claims asserted herein because such

claims would not covered under the Microsoft D&O insurance policy. As a result, there is no majority of disinterested directors among the Board and demand is excused as futile.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Breach of Fiduciary Duty**
**(Against All Defendants)**

140. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

141. The Defendants owed and owe Microsoft fiduciary obligations of good faith, fair dealing, loyalty and due care.

142. The Individual Defendants, individually and collectively, as a result of the alleged herein, breached their fiduciary duties of candor, good faith, care and loyalty.

143. As a direct and proximate results of the breaches of fiduciary obligations, Microsoft has been harmed, as alleged herein.

144. Plaintiffs seeks declaratory and injunctive relief to remedy Defendants' breaches of fiduciary duty.

### SECOND CAUSE OF ACTION

**Violation of Section 14(a) of the Securities Exchange Act**
**(Against All Director Defendants)**

145. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though set forth fully herein. Plaintiff specifically disavows any allegation of fraud in connection with this claim for violation of Section 14(a).

146. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of

such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to Section 12 of this title [15 U.S.C. § 781]."

147. Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

148. The Director Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78N(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

149. The Director Defendants, individually and collectively, disseminated and/or permitted the dissemination of materially false and misleading statements in the Company's Proxy Statements.

150. Both the 2024 and 2025 Proxy Statements were solicitations for shareholders to vote in connection with the re-election of the Director Defendants and approval of executive compensation, among other things. These Proxy Statements also included shareholder proposals addressing Microsoft's AI strategy and usage and the Director Defendants' recommendations against such proposals.

151. As alleged herein, the 2024 and 2025 Proxy Statements were materially false and misleading because each contained affirmative misstatements and omissions of material facts. The material omissions rendered the affirmative statements in the Proxy Statements materially

misleading because the Director Defendants omitted all additional information necessary to make the statements not misleading. See 17 C.F.R. § 240.12b-20.

152. In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or omitting material facts, the statements contained in the Proxy Statements were materially false and misleading.

153. The materially false and misleading statements in the Proxy Statements misled shareholders and caused them to vote in favor of the re-election of the Director Defendants thereby allowing them to continue breaching their fiduciary duties to the Company.

154. The Company was damaged as a result of the Director Defendants' material misrepresentations and omission in the Proxy Statements.

**THIRD CAUSE OF ACTION**

**Unjust Enrichment**
**(Against the Officer Defendants)**

155. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

156. As a result of their wrongful acts and omissions, the Officer Defendants received unjust compensation and were unjustly enriched at the expense of and to the ultimate detriment of the Company.

157. During the Relevant Period, the Officer Defendants either received bonuses, stock options and/or similar compensation from the Company, which was tied to Microsoft's financial performance or received compensation that was unjust given the Officer Defendants' bad faith conduct. As alleged herein, Nadella alone received unjust compensation in the amount of $224,115,510 between 2023-2025.

158. Defendant Hood was compensated as follows during the Relevant Period:

| Year | Salary | Stock Awards | Non-equity Incentive Plan Compensation | All other Compensation | Total |
|---|---|---|---|---|---|
| 2023 | $1,000,000 | $16,450,701 | $2,295,250 | $156,946 | $19,892,897 |
| 2024 | $1,000,000 | $21,094,956 | $3,642,750 | $61,500 | $25,799,206 |
| 2025 | $1,000,000 | $25,037,360 | $3,421,000 | $23,191 | $29,481,551 |

159. Defendants Spataro's and Jha's compensation are not reported in the Company's public filings and thus, discovery is necessary to allege their compensation with greater specificity.

160. Plaintiff, as a shareholder and representative of the Company, seeks restitution from the Officer Defendants and seeks to disgorge all profits, benefits, and other compensation, including any performance-based incentives or compensation obtained by the Officer Defendants due to their wrongful conduct and breach of fiduciary duties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgement, as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of Microsoft and that Plaintiff is an adequate representative to serve in that capacity;

B. Declaring that Defendants have breached their fiduciary duties to Microsoft;

C. Determining and awarding to Microsoft the damages sustained as a result of the violations alleged herein by all Defendants, jointly and severally, together pre- and post-judgment interest thereon;

D. Directing Microsoft to take necessary action to reform and improve its corporate governance, internal controls, and policies through implementation of a Board-level reporting and information system and monitoring protocol to ensure that the Company

addresses copyright infringement in any form, and any other civil and criminal law violations related to copyright infringement and intellectual property rights;

E. Awarding against all Defendants and in favor of the Company extraordinary equitable and injunctive relief as permitted by law and/or equity as this Court deems just and appropriate;

F. Awarding Plaintiff's costs and disbursements including, but not limited to attorneys' fees and expenses; and

G. Granting such other relief as this Court deems just and appropriate.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED: September 8, 2026

Respectfully submitted,

*/s/ Gregory F. Wesner*

Gregory F. Wesner, WSBA No. 30241
**HERMAN JONES LLP**
15113 Washington Ave NE
Bainbridge Island, WA 98110
Telephone: (206) 819-0821
gwesner@hermanjones.com

John C. Herman
**HERMAN JONES LLP**
3424 Peachtree Road NE, Suite 1650
Atlanta, GA 30326
Telephone: (404) 504-6500
Facsimile: (404) 504-6501
jherman@hermanjones.com

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Benjamin Y. Kaufman
Patrick Donovan
270 Madison Avenue
New York, NY 10016

Tel: (212) 545-4600
Fax: (212) 686-0114
Kaufman@whafh.com
donovan@whafh.com

**ISQUITH LAW PLLC**
Fred T. Isquith
103 E 84th Street
New York, NY 10028
Tel: (718) 775-6478
Isquithlaw@gmail.com

**VITA LAW OFFICES P.C.**
Richard Vita
100 State Street
Boston, MA 02109
Tel: (617) 466-6237
rjv@vitalaw.com

*Counsel for Plaintiff Katelyn Gray*

**VERIFICATION**

I, Katelyn Gray, verify that I am a shareholder of nominal defendant Microsoft Corporation (the "Company"), and that I have continuously owned stock in the Company at all relevant times. I have reviewed the allegations in this Shareholder Derivative Complaint (the "Complaint"). As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true. Having received a copy of the Complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 14 2026

Katelyn Gray

Katelyn Gray